**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN STILLMAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MOBILE MINI, INC., ERIK OLSSON, KELLY WILLIAMS, FREDERICK G. MCNAMEE, JEFFREY S. GOBLE, JAMES J. MARTELL, KIMBERLY J. MCWATERS, LAWRENCE TRACHTENBERG, MICHAEL L. WATTS, SARA R. DIAL, STEPHEN A. MCCONNELL, and MICHAEL W. UPCHURCH,<br><br>Defendants. | Case No. 1:20-cv-03359<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Brian Stillman ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Mobile Mini, Inc. ("Mobile Mini" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants" and, together with Mobile Mini, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between Mobile Mini and WillScot Corporation ("WillScot").

2.     On March 1, 2020, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive 2.4050 shares of WillScot common stock for each share of Mobile Mini stock they own (the "Merger Consideration").  Upon completion of the merger, Mobile Mini shareholders will own approximately 46% and WillScot shareholders will own approximately 54% of the combined company.

3.     On April 17, 2020, in order to convince Mobile Mini shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form S-4 (the "S-4") Registration Statement with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.  The materially incomplete and misleading S-4 violates SEC Rule 14a-9 (17 C.F.R. § 240.14a-9).

4.     While touting the fairness of the Merger Consideration to the Company's shareholders in the S-4, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the S-4 materially incomplete and misleading.

5.     In particular, the S-4 contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that Mobile Mini shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by Mobile Mini's financial advisors, Barclays Capital Inc. ("Barclays") and Goldman Sachs & Co. LLC ("Goldman Sachs") in support of their opinions that the Merger Consideration is fair to shareholders, on which the Board relied.

6.      It is imperative that the material information that has been omitted from the S-4 is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Mobile Mini shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

<u>**JURISDICTION AND VENUE**</u>

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because a substantial portion of the alleged wrongs took

place in this District and the Company's common stock trades on the NASDAQ Composite, which is headquartered in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a holder of Mobile Mini common stock.

12.     Defendant Mobile Mini is incorporated in Delaware and maintains its principal executive offices at 4646 E. Van Buren Street, Suite 400, Phoenix, Arizona 85008.   The Company's common stock trades on the NASDAQ under the ticker symbol "MINI."

13.     Individual Defendant Erik Olsson is Mobile Mini's Chairman and has been a director of Mobile Mini at all relevant times.

14.     Individual Defendant Kelly Williams is Mobile Mini's President and Chief Executive Officer and has been a director of Mobile Mini at all relevant times.

15.     Individual Defendant Frederick G. McNamee has been a director of Mobile Mini at all relevant times.

16.     Individual Defendant Jeffrey S. Goble has been a director of Mobile Mini at all relevant times.

17.     Individual Defendant James J. Martell has been a director of Mobile Mini at all relevant times.

18.     Individual Defendant Kimberly J. McWaters has been a director of Mobile Mini at all relevant times.

19.     Individual Defendant Lawrence Trachtenberg has been a director of Mobile Mini at all relevant times.

20.     Individual Defendant Michael L. Watts has been a director of Mobile Mini at all relevant times.

21.     Individual Defendant Sara R. Dial has been a director of Mobile Mini at all relevant times.

22.     Individual Defendant Stephen A. McConnell has been a director of Mobile Mini at all relevant times.

23.     Individual Defendant Michael W. Upchurch has been a director of Mobile Mini at all relevant times.

24.     The Individual Defendants referred to in paragraphs 13-23 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Mobile Mini (the "Class").   Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

26.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of March 1, 2020, there were approximately 49,000,000 shares of Mobile Mini common stock outstanding, held by hundreds of individuals and entities scattered throughout the country.  The actual number of public shareholders of Mobile Mini will be ascertained through discovery;

b.      There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)      whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the S-4 in violation of Section 14(a) of the Exchange Act;

iii)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading S-4.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.      The Proposed Transaction

27.      Mobile Mini is a leading provider of portable storage solutions that is committed to providing its customers with superior services and access to a high-quality and diverse fleet. Additionally, the Company is a leading provider of specialty containment solutions in the United States.

28.      On March 2, 2020, Mobile Mini and WillScot issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

BALTIMORE and PHOENIX, March 02, 2020 (GLOBE NEWSWIRE) -- WillScot Corporation (NASDAQ: WSC) ("WillScot") and Mobile Mini, Inc. (NASDAQ: MINI) today announced the companies have entered into a definitive merger agreement under which WillScot, a leading specialty rental services provider of innovative modular space and portable storage solutions across North America, will combine with Mobile Mini, a leading provider of portable storage solutions serving customers in the U.S., U.K., and Canada. Mobile Mini stockholders will receive 2.4050 shares of WillScot common stock for each share of Mobile Mini common stock in an all-stock merger of equals transaction.

The implied total enterprise value of the combined company is approximately $6.6 billion. Upon completion of the transaction, current WillScot and Mobile Mini

stockholders will own 54% and 46% of the combined company, respectively. The transaction is expected to close in the third quarter of 2020.

This combination brings together WillScot's leading modular space capabilities with Mobile Mini's leading portable storage solutions. The combined company will benefit from complementary capabilities, a diverse customer base, a broad geographic footprint, increased scale, and multiple levers for growth driven by enhanced product and service offerings as well as significant cost savings.

Brad Soultz, President and Chief Executive Officer of WillScot, commented, "Today's announcement represents a milestone event for both WillScot and Mobile Mini. The combination of our two great companies creates a leading provider of modular space and portable storage solutions, with a broadened footprint and expanded fleet ideally positioned to benefit from the cross-selling of WillScot's Ready to Work solutions and Mobile Mini's managed services offerings. The combined company will benefit from diversified and predictable lease revenue streams, as well as a strong balance sheet and robust free cash flow2 profile, facilitating further growth and enhancing our ability to generate superior returns for our stockholders. I am very excited to combine with Mobile Mini and could not be prouder of the WillScot team that made it possible."

Kelly Williams, President and Chief Executive Officer of Mobile Mini, said, "We are pleased to join forces with WillScot to offer customers the largest portfolio of modular space and portable storage solutions in North America. We look forward to working with the WillScot team to successfully integrate our great businesses and deliver strong, predicable growth and profitability to stockholders over the long term, all while maintaining our commitment to our culture and focus on customer service."

**Compelling Strategic Rationale**

- Combines two iconic industry leaders – a leading provider of modular space solutions and a leading provider of portable storage solutions – with best-in class teams and proven track records of delivering profitable growth and stockholder value.
- Creates industry-leading specialty leasing platform with enhanced ability to serve customers through a combination of distinct but complementary portfolios with leading brands and broad geographic footprint.
- $50 million of anticipated annual cost synergies for this transaction with significant upside for incremental revenue synergies supported by cross-customer pull through, expansion of WillScot's value adding products and services offering across Mobile Mini's steel ground level offices, and expansion of Mobile Mini's managed services offering across WillScot's customer base.
- Strengthens combined customer valuation proposition across diverse end markets via pull through from modular to storage and vice versa.

- Significant capital allocation flexibility underpinned by an expected combined free cash flow2 of greater than $290 million and supported by a $2.9 billion NBV fleet generating predictable and strong recurring revenue with >30 months average lease duration and >20 years average useful asset life.
- Builds on WillScot's track record of successfully integrating the ModSpace, Tyson and Acton acquisitions, while driving over $70 million of annual cost synergies.

**Organizational Structure**

Following the close of the transaction, Brad Soultz, WillScot's Chief Executive Officer, will serve as Chief Executive Officer of the combined company, Kelly Williams, Mobile Mini's President and Chief Executive Officer, will serve as President and Chief Operating Officer of the combined company, Tim Boswell, WillScot's Chief Financial Officer, will serve as Chief Financial Officer of the combined company and Chris Miner, Mobile Mini's General Counsel, will serve as General Counsel of the combined company.

The combined company's board of directors will consist of 11 directors, 6 of which are members from the WillScot Board of Directors and 5 of which are members from the Mobile Mini Board of Directors. Erik Olsson, the Non-Executive Chairman of the Board of Directors of Mobile Mini, will serve as Non-Executive Chairman of, and Gerry Holthaus, Non-Executive Chairman of the Board of Directors at WillScot, will serve as Lead Independent Director of, the board of directors of the combined company.

**Combination Overview and Financial Rationale**

Mobile Mini stockholders will receive 2.4050 shares of WillScot common stock for each share of Mobile Mini common stock held and, based on the closing price of WillScot's Class A common stock on February 28, 2020, the consideration implies a premium of 8% to the closing price of Mobile Mini common stock on the same day. As part of the transaction, TDR Capital will exchange all of its shares of Williams Scotsman Holdings Corp. into approximately 10.6 million shares of WillScot Class A common stock pursuant to the Exchange Agreement dated November 29, 2017 among WillScot, Williams Scotsman Holdings Corp. and affiliates of TDR Capital, and all shares of WillScot's Class B Common Stock will be cancelled for no consideration. Upon the effective time of the merger, the combined company will have a single class of common stock.

This combination is expected to result in an estimated enterprise value for the combined company at announcement of $6.6 billion, $1.7 billion in combined 2019 revenue and ~$650 million in combined 2019 Adjusted EBITDA1, including an estimated $50 million of cost synergies from this transaction. With over $290 million of annual free cash flow2 generation and net leverage of 3.8x3 Adjusted

EBITDA1 at close, this transaction demonstrates the combined company's financial strength, significant liquidity, and cash flow generation to provide for ongoing growth and stockholder value creation.

Additionally, the management teams anticipate $50 million in annualized gross pre-tax cost synergies, approximately 80% of which are expected to be realized in the combined company's run-rate within two years of closing. The cost of achieving the synergies is expected to be approximately 150% of the total cost synergies. Significant opportunities for long-term revenue synergy generation are also anticipated, supported by a broad expansion of service offerings. The transaction is expected to be highly accretive with greater than 10% free cash flow2 per share accretion by end of 2021.

The transaction has been approved by the Boards of Directors of WillScot and Mobile Mini. The transaction is subject to customary closing conditions, including receipt of customary antitrust approval and approval by the stockholders of each company, and is expected to close in third quarter of 2020. Additionally, the transaction also has the support of TDR Capital, which has entered into a customary voting agreement in support of the transaction. TDR Capital will be subject to a contractual lock-up for six months following closing. In the first year following the lock-up, TDR Capital will be prohibited from selling more than 50% of its shares of the combined company.

Morgan Stanley & Co. LLC served as the lead financial advisor to WillScot, Rothschild & Co. served as the financing advisor to WillScot, and Stifel, Nicolaus & Co., Inc. served as the financial advisors to the special committee of WillScot's Board of Directors. BofA Securities Inc., Deutsche Bank Securities Inc., and J.P. Morgan Securities LLC served as additional financial advisors to WillScot. Allen & Overy LLP acted as external legal counsel to WillScot. Barclays Capital Inc. and Goldman Sachs & Co. LLC served as the financial advisors to Mobile Mini, and Davis Polk & Wardwell LLP acted as external legal counsel to Mobile Mini.

1 - Adjusted EBITDA of $357 million for the 12 months ended December 31, 2019 at WillScot is defined as net income (loss) before income tax expense, net interest expense, depreciation and amortization adjusted for non-cash items considered non-core to business operations including net currency gains and losses, goodwill and other impairment charges, restructuring costs, costs to integrate acquired companies, costs incurred related to transactions, non-cash charges for stock compensation plans, and other discrete expenses.  Adjusted EBITDA of $243 million for the 12 months ended December 31, 2019 at Mobile Mini is defined as net income before discontinued operations, net of tax (if applicable), interest expense, income taxes, depreciation and amortization, and debt restructuring or extinguishment expense (if applicable), including any write off of deferred financing costs, further adjusted to exclude certain non-cash expenses, including share based compensation, as well as transactions that management believes are not indicative of their business.

2 - Combined 2020E standalone Free Cash Flow, where Free Cash Flow is defined as Cash Flow from Operations – Net Capex. Net Capex is defined as purchases of rental equipment and refurbishments and purchases of property, plant and equipment, less proceeds from sale of rental equipment and proceeds from the sale of property, plant and equipment, which are all included in cash flows from investing activities.

3 - Including $50M of anticipated run-rate cost synergies for this transaction and estimated 2020 WillScot remaining cost synergies (net of inflation) of $29M from prior acquisitions (ModSpace, Acton and Tyson).

**Conference Call Information**

The companies will host a joint conference call and webcast today at 8:00 a.m. EST to discuss this announcement and WillScot's fourth quarter and full year 2019 financial results. Participants on the call will include Brad Soultz and Tim Boswell, President and Chief Executive Officer and Chief Financial Officer respectively, of WillScot, and Kelly Williams, President and Chief Executive Officer of Mobile Mini.

The live call can be accessed by dialing (855) 312-9420 (U.S./Canada toll-free) or (210) 874-7774 (International) and asking to be connected to the WillScot - Mobile Mini call. A live webcast will also be accessible via the "Events & Presentations" section of the Company's Investor Relations website https://investors.willscot.com. Choose "Events" and select the information pertaining to the Mobile Mini Merger Conference Call. Additionally, there will be slides accompanying the webcast. Please allow at least 15 minutes prior to the call to register, download and install any necessary software. For those unable to listen to the live broadcast, an audio webcast of the call will be available after the call on the Company's Investor Relations website.

**About WillScot Corporation**
Headquartered in Baltimore, Maryland, WillScot is the public holding company for the WillScot family of companies. WillScot trades on Nasdaq under the ticker symbol "WSC," and is a specialty rental services market leader providing innovative modular space and portable storage solutions across North America. WillScot is the modular space supplier of choice for the construction, education, health care, government, retail, commercial, transportation, security and energy sectors. With over half a century of innovative history, organic growth and strategic acquisitions, WillScot serves a broad customer base from over 120 locations throughout the US, Canada and Mexico, with a fleet of approximately 150,000 modular space and portable storage units.

**About Mobile Mini**
Mobile Mini, Inc. is a leading provider of portable storage solutions through its total rental fleet of approximately 200,200 storage solutions containers and office

units and a leading provider of tank and pump solutions in the U.S., with a rental fleet of approximately 12,700 units. Mobile Mini's network is comprised of 156 locations in the U.S., U.K., and Canada. Mobile Mini is included on the Russell 2000® and 3000® Indexes and the S&P Small Cap Index.

29.     Mobile Mini is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the S-4, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

30.     If the false and/or misleading S-4 is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.     The Materially Incomplete and Misleading S-4

31.     On April 17, 2020, Defendants caused the S-4 to be filed with the SEC in connection with the Proposed Transaction.  The S-4 solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

*The Materiality of Financial Projections*

32.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the S-4 discloses that "[i]n connection with a possible transaction with WillScot, Mobile Mini management prepared certain non-public, unaudited prospective financial information regarding the anticipated results of operations for fiscal years 2020 through 2024 of each of Mobile Mini and WillScot."  S-4 131.  The Company's management also prepared forecasts for the combined company with WillScot management.  *Id.* at 134.

33.     When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

34.     Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items."  17 C.F.R. § 229.10(b)(2).

35.     In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

(i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

(ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

36.    Here, Mobile Mini's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that the Board specifically relied on the financial forecasts in reaching its decision to, among other things, approve the Merger Agreement and the transactions contemplated by it.  S-4 80-81.

37.    As discussed further below, the non-GAAP financial projections used do not provide Mobile Mini's shareholders with a materially complete understanding of the assumptions and key factors considered in developing the financial projections, which assumptions, factors, and other inputs the Board reviewed.

**The Financial Projections Relied on by the Board**

38.    The S-4 discloses that "[i]n connection with a possible transaction with WillScot, Mobile Mini management prepared certain non-public, unaudited prospective financial information regarding the anticipated results of operations for fiscal years 2020 through 2024 of

each of Mobile Mini and WillScot." *Id.* at 131.  The Company's management also prepared forecasts for the combined company with WillScot management. *Id.* at 134.

39.     The S-4 goes on to disclose, *inter alia*, forecasted values for Mobile Mini and WillScot projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2020 through 2024 for (1) Adjusted EBITDA, (2) Adjusted EBIT and (3) Unlevered Free Cash Flow, but fails to provide (i) the line items used to calculate these non-GAAP metrics or (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.*

40.     The S-4 defines Adjusted EBITDA as "earnings before income tax expense, net interest expense, depreciation and amortization, excluding any non-cash items considered non-core to business operations." *Id.* at 133 n.1.  Nevertheless, the S-4 fails to reconcile Adjusted EBITDA to its most comparable GAAP measure or disclose the line items used to calculate Adjusted EBITDA, rendering the S-4 materially false and/or misleading. *Id.*

41.     The S-4 defines Adjusted EBIT as "earnings before income tax expense and net interest expense, excluding any non-cash items considered non-core to business operations and as burdened by share-based compensation." *Id.* at 133 n.2.  Nevertheless, the S-4 fails to reconcile Adjusted EBIT to its most comparable GAAP measure or disclose the line items used to calculate Adjusted EBIT, rendering the S-4 materially false and/or misleading. *Id.*

42.     The S-4 provides two different definitions for Unlevered Free Cash Flow ("UFCF").  The first definition of UFCF, as calculated by Barclays, is "Adjusted EBITDA less share-based compensation, non-cash items considered non-core to business operations, cash taxes (excluding any tax savings from the use of net operating losses), net capital expenditures (defined as capital expenditures in excess of dispositions), net property, plant and equipment (defined as additions of property, plant and equipment in excess of dispositions), gain on sale of fleet and

property, plant and equipment, plus the provision for doubtful accounts and adjusting for changes in net working capital." *Id.* at 133 n.3.  The second definition of UFCF, as calculated by Goldman Sachs, is "Adjusted EBITDA less share-based compensation, non-operating expenses considered non-core to business operations, taxes (excluding any tax savings from the use of net operating losses), net capital expenditures (including net property, plant and equipment, and defined as capital expenditures in excess of dispositions), and gain on sale of fleet and property, plant and equipment, plus the provision for doubtful accounts, and adjusting for changes in net working capital." *Id.* at 133 n.4.  Nevertheless, the S-4 fails to reconcile either definition of UFCF to its most comparable GAAP measure or disclose the line items used to calculate either definition of UFCF, rendering the S-4 materially false and/or misleading. *Id.*

43.     Thus, the S-4's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

44.     The non-GAAP financial projections disclosed on page 133 and 135 of the S-4 violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading as without any correlation with their

GAAP equivalent financial metrics, shareholders are unable to discern the veracity of the financial projections.

45.     As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

### *The Financial Projections Violate Regulation G*

46.     The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

47.     Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

---

[1]     Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[2]     Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]     SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

[4]     SEC, *Final Rule.*

48.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5] Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Mobile Mini included in the S-4 here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

49.     The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions. *Compare Youku Tudou Inc., et al.*, Correspondence to SEC 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff

---

[5]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[6]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

[7]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence to SEC 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

50.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the S-4 into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9

51.     In addition to the S-4's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences

---

[8]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

[9]     *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm.  *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename 1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.  The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect.  The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited Oct. 28, 2019).

between the non-GAAP financial measures and their respective most comparable GAAP financial measures. Nor can shareholders compare the Company's financial prospects with similarly situated companies.

52. Such projections are necessary to make the non-GAAP projections included in the S-4 not misleading for the reasons discussed above. Indeed, Mobile Mini acknowledges that "Non-GAAP financial measures are not prepared in accordance with GAAP, are not reported by all of Mobile Mini's competitors and may not be directly comparable to similarly titled measures of Mobile Mini's competitors or other companies generally. Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in accordance with GAAP." *Id.* at 132.

53. As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

54. In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 133 and 135, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

### *The Materially Misleading Financial Analyses*

55. The summary of the valuation methodologies utilized by Barclays and Goldman Sachs, including the utilization of certain of the non-GAAP financial projections described above by Barclays and Goldman Sachs, in connection with its valuation analyses (*id.* at 105, 119) is misleading in violation of Regulation 14a-9. The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently. Once an S-4 discloses internal projections relied upon by the Board, those projections must be complete and accurate.

56.     With respect to Barclays's *Mobile Mini Standalone Present Value of Future Share Price Analysis*, the S-4 fails to disclose Mobile Mini's projected annual dividends, the Company's net debt for each fiscal year 2020 to 2022 or the number of fully diluted shares of Mobile Mini common stock outstanding.

57.     With respect to Barclays's *Combined Company Present Value of Future Share Price Analysis*, the S-4 fails to disclose the expected phased in synergies and costs expected to achieve those synergies, the combined company's net debt for each fiscal year 2020 to 2022 or the number of fully diluted shares of Mobile Mini common stock outstanding.

58.     With respect to Goldman Sachs's *Mobile Mini Standalone present Value of Future Share Price Analysis*, the S-4 fails to disclose the cumulative dividends per share expected to be paid to Mobile Mini shareholders in each fiscal year 2020 to 2022, the Company's forecasted net debt for each end of fiscal year 2020 to 2022 or the number of fully diluted shares of Mobile Mini common stock outstanding.

59.     With respect to Goldman Sachs's *Pro Forma Present Value to be Received per Share of Mobile Mini Common Stock*, the S-4 fails to disclose the phased-in cost synergies and the expected costs to achieve the synergies, the combined company's pro forma net debt for each fiscal year 2020 to 2022, the expected dividends to be paid prior to the close of the merger or the number of shares expected to be outstanding of the combined company following the merger.

60.     Barclays and Goldman Sachs both performed a discounted cash flow analysis on Mobile Mini and the combined company.  With respect to Barclays's *Mobile Mini Standalone Discounted Cash Flow Analysis*, the S-4 states Barclays calculated Mobile Mini's enterprise value by adding Mobile Mini's projected unlevered free cash flows for fiscal years 2020 through 2024 to the Company's terminal value as of December 31, 2024 and discounted this sum to December

31, 2019. *Id.* at 111. Barclays calculated the terminal value by applying a perpetuity growth rate range of 2.0% to 3.0%. *Id.* Barclays utilized a discount rate range of 8.5% to 9.5% that was selected based on an analysis of the Company's weighted average cost of capital and selected comparable companies. *Id.* Barclays then subtracted the net debt and added the estimated present value of the net operating losses and divided by the fully diluted shares outstanding of Mobile Mini. *Id.*

61.     With respect to Barclays's *Combined Company Discounted Cash Flow Analysis*, the S-4 states Barclays calculated the estimated enterprise value of the combined company by adding the combined company's projected unlevered free cash flows for fiscal years 2020 through 2024 to the combined company's terminal value as of December 31, 2024 and discounted this sum to December 31, 2019. *Id.* at 111. Barclays calculates the terminal value by applying a perpetuity growth rate range of 2.25% to 3.25%. *Id.* at 112. Barclays utilized a discount rate range of 8.5% to 9.5% that was selected based on an analysis of the combined company's weighted average cost of capital and selected comparable companies. *Id.* Barclays then subtracted the combined company's pro forma net debt and estimated transactions fees in connection with the merger, added the estimated present value of net operating losses of the combined company and the estimated present value of the net cost synergies, and divided by the estimated number of fully diluted shares outstanding of the combined company. *Id.*

62.     With respect to Goldman Sachs's *Mobile Mini Standalone Discounted Cash Flow Analysis*, the S-4 states Goldman Sachs discounted estimates of Mobile Mini's unlevered free cash flow for the years 2020 through 2024 and a range of terminal values to December 31, 2019 using a discount rate range of 6.50% to 7.50%, which reflected estimates of the Company's weighted average cost of capital. *Id.* at 121. Goldman Sachs calculated the terminal value by applying a

perpetuity growth rate range of 1.00% to 2.00% to the terminal year estimate of free cash flow. *Id.* Goldman Sachs also discounted the estimated benefits of Mobile Mini's net operating losses for the years 2020 through 2024 using a discount rate range of 6.50% to 7.50%, reflecting the Company's weighted average cost of capital. *Id.* Goldman Sachs then subtracted Mobile Mini's net debt and divided by the number of fully diluted shares of the Company outstanding. *Id.*

63. With respect to Goldman Sachs's *Combined Company Pro Forma Discounted Cash Flow Analysis*, the S-4 states Goldman Sachs discounted estimates of the combined company's unlevered free cash flow for years 2020 through 2024 and a range of terminal values to December 31, 2019 using a discount rate range of 6.75% to 7.75%, which reflected estimates of the combined company's weighted average cost of capital. *Id.* at 121-122. Goldman Sachs calculated the terminal value by applying a perpetuity growth rate range of 1.25% to 2.25% to the terminal year estimate of free cash flow. *Id.* Goldman Sachs also discounted the estimated benefits of the combined company's net operating losses for the years 2020 through 2024 and the estimated benefits of the phases in cost synergies from the merger using a discount rate range of 6.75% to 7.75%, reflecting the combined company's weighted average cost of capital. *Id.* Goldman Sachs then subtracted the combined company's pro forma net debt and estimated transaction fees in connection with the merger and divided by the number of fully diluted shares estimated to be outstanding of the combined company following the merger. *Id.*

64. With respect to Barclays's *Mobile Mini Standalone Discounted Cash Flow Analysis*, the S-4 fails to disclose the calculated range of terminal values, the inputs used to calculate the Company's weighted average cost of capital, the Company's net debt, the estimated present value of the net operating losses or the number of fully diluted shares of Mobile Mini outstanding.

65.     With respect to Barclays's *Combined Company Discounted Cash Flow Analysis*, the S-4 fails to disclose the calculated range of terminal values, the inputs used to calculate the combined company's weighted average cost of capital, the combined company's pro forma net debt and estimated transactions fees in connection with the merger, the estimated present value of net operating losses of the combined company, the estimated present value of the net cost synergies associated with the merger or the number of fully diluted shares of the combined company expected to be outstanding.

66.     With respect to Goldman Sachs's *Mobile Mini Standalone Discounted Cash Flow Analysis*, the S-4 fails to disclose the calculated range of terminal values, the inputs used to calculate the Company's weighted average cost of capital, the present value of the estimated benefits of Mobile Mini's net operating losses, the Company's net debt or the number of fully diluted shares of the Company outstanding.

67.     With respect to Goldman Sachs's *Combined Company Pro Forma Discounted Cash Flow Analysis*, the S-4 fails to disclose the calculated range of terminal values, the inputs used to calculate the combined company's weighted average cost of capital, the present value of the combined company's net operating losses and the estimated benefits of the phases in cost synergies from the merger, the combined company's pro forma net debt and estimated transaction fees in connection with the merger or the number of fully diluted shares estimated to be outstanding of the combined company following the merger.

68.     Since information was omitted, shareholders are unable to discern the veracity of Barclays's and Goldman Sachs's discounted cash flow analyses.  Without further disclosure, shareholders are unable to compare Barclays's and Goldman Sachs's calculations with the Company's financial projections.  The absence of any single piece of the above information

renders Barclays's and Goldman Sachs's discounted cash flow analyses incomplete and misleading.  Thus, the Company's shareholders are being materially misled regarding the value of the Company.

69.     As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value . . . ."  *Id*. (footnote omitted).  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . .  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

70.     Therefore, in order for Mobile Mini shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

71.     In sum, the S-4 independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to its most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the S-4 independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the S-4 to garner votes in support of the Proposed Transaction from Mobile Mini shareholders.

72.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

73.     Further, failure to remedy the deficient S-4 and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)

74.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

75.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [S-4] or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

76.     As set forth above, the S-4 omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other

things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most comparable" GAAP measure.  17 C.F.R. § 244.100(a).

77.     The failure to reconcile the non-GAAP financial measures included in the S-4 violates Regulation G and constitutes a violation of Section 14(a).

78.     As a direct and proximate result of the dissemination of the false and/or misleading S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

79.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

80.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

81.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that

- 27 -

measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

82.     Defendants have issued the S-4 with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

83.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4 but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

84.     The Individual Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

85.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading.

86.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4.  The preparation of a registration statement by corporate insiders containing

materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

87.    Mobile Mini is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4.

88.    The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

89.    As a direct and proximate result of the dissemination of the false and/or misleading S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT III

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

90.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

91.    The Individual Defendants acted as controlling persons of Mobile Mini within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as

directors and/or officers of Mobile Mini, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

92.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

93.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.   The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing the S-4.

94.     In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

95.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

96.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the S-4;

C.     Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing and to award damages arising from proceeding with the Proposed Transaction;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 29, 2020

<div style="margin-left: 40%;">

Respectfully submitted,

By: *James M. Wilson, Jr.*
Nadeem Faruqi
James M. Wilson, Jr.
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com
            jwilson@faruqilaw.com

*Counsel for Plaintiff*

</div>

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Brian Stillman ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against Mobile Mini Inc. ("Mobile") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in Mobile securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 27th day of April, 2020.

_Brian Stillman_
Brian Stillman

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 06/18/19 | 350 |
|  |  |  |
|  |  |  |